# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-1572V**
UNPUBLISHED

RAQUEL HERNANDEZ,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Chief Special Master Corcoran

Filed: April 6, 2023

Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Guillain-Barré Syndrome (GBS)

*John Leonard Shipley, Davis, CA, for Petitioner.*

*Alexis B. Babcock, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On July 14, 2021, Raquel Hernandez filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered from Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine she received on September 19, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although Respondent conceded entitlement, the parties were not able to settle damages.

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

After hearing argument from the parties at a "Motions Day" proceeding, I find that Petitioner is entitled to an award of damages in the amount of **$195,952.74**, **representing $192,000.00 for actual pain and suffering, $3,608.64 in unreimbursed out-of-pocket expenses, and $344.10 in future out-of-pocket expenses.**

## I. Relevant Procedural History

This case was filed on July 14, 2021. ECF No. 1. On July 25, 2022 (just over one year later), Respondent filed a Rule 4(c) Report conceding entitlement. ECF No. 21. A Ruling on Entitlement was issued the following day. ECF No. 22. After a short attempt at resolving the issue of damages, the parties informed me in September 2022 that they were unable to reach an agreement. ECF No. 32. Petitioner filed a Brief Regarding Damages ("Br.") on November 4, 2022. ECF No. 35. Respondent filed a responsive brief ("Resp.") on December 1, 2022. ECF No. 36. I proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed issues. ECF No. 38. That hearing was held on March 24, 2023, and the case is now ripe for resolution.

Petitioner argues that an award of $225,000 in past pain and suffering, plus future pain and suffering of $1,000 per year and future out-of-pocket expenses of $500 per year for the remainder of Ms. Hernandez's life expectancy, is appropriate. Br. at 16-19. Petitioner highlights the severity of her GBS symptoms, particularly early in her course of treatment, the long duration of her suffering, and her ongoing physical limitations that continue to require physical therapy treatment. *Id.* In addition, Petitioner requests $3,608.64 as reimbursement for past unreimbursable out-of-pocket expenses. ECF No. 42.

Respondent, by contrast, proposes that an award of $170,000 in pain and suffering is appropriate because "Petitioner's GBS course was relatively consistent with those cases cited by Petitioner with mild-to-moderate sequela." Resp. at 9. Respondent notes that Petitioner did not experience any "traumatic procedures" experienced by petitioners in other Vaccine cases. *Id*. at 11. Respondent opposes awards for future pain and suffering and future out-of-pocket expenses, but does not dispute Petitioner's out-of-pocket expenses calculation. *Id.* at 11-12; ECF No. 42.

## II. Relevant Medical History

Petitioner was 43 years old when she received the flu vaccine on September 19, 2019 in Modesto, CA. Ex. 2 at 7. Prior to her vaccination, Ms. Hernandez was an active mother to her three children and enjoyed hiking, dancing, and going to the beach. Ex. 9

at ¶21. She also helped to care for her father-in-law, who had had a severe stroke. *Id*. at ¶20.

Petitioner presented to an urgent care on September 25, 2019 (6 days post-vaccination) complaining of diarrhea. Ex. 8 at 2. She was assessed with a fever and instructed to go to the emergency room. *Id*. at 6. At the emergency room, Petitioner complained of fever, diarrhea, and abdominal pain. Ex. 3, Part I at 6. She was assessed and then discharged. *Id.*

Petitioner returned to the emergency room five days later, on September 30, 2019, complaining of fever, headache, abdominal pain, vomiting, and increased urination. Ex.3 Part I at 52. A CT scan was normal and a lumbar puncture was proposed, but Petitioner declined. *Id*. at 54. She was discharged again. *Id.*

The following day, October 1, 2019, Petitioner was transported by ambulance to the emergency room. Ex. 3, Part I at 117; Ex. 6 at 12-16. She reported generalized weakness that began that morning, which progressed so that she was unable to walk by evening. *Id.* A lumbar puncture was performed and was abnormal. *Id*. at 121. Petitioner was admitted with suspicion of meningitis. *Id*. The following day, October 2, 2019, Petitioner was evaluated by a neurologist, who believed the lumbar puncture results supported a diagnosis of aseptic meningitis – however Petitioner's clinical exam was consistent with GBS. Ex. 3, Part I at 137, 142. She was prescribed IVIG for five days. *Id*. at 143.

On October 11, 2019, after ten days in the hospital, Petitioner was discharged to acute inpatient rehab where she stayed through October 29, 2019 (an additional 18 days). Ex. 3 at 111; Ex 4 at 234. Petitioner's treating doctors recommended a skilled nursing facility; however, Petitioner and her family did not approve of the proposed facility and requested an alternative. *Id.* Upon learning that the preferred facility was a higher level of care than she required, Petitioner was discharged home "against medical advice." Ex. 5 at 73-74.

Between October 31, 2019 and December 26, 2019, Petitioner had physical (22 sessions) and occupational (9 sessions) therapy, and nurse visits (6) from home health care. Ex. 7 at 2-64.

On November 12, 2019, Petitioner followed up with a neurologist, Dr. Lizama. Ex. 5 at 172. Petitioner noted improving strength on a daily basis, with some continued burning paresthesias in her legs that were well controlled with gabapentin. *Id.* She was still non-ambulatory. *Id*. at 176. On November 15, 2019, Petitioner established care with a new primary care provider ("PCP"). Ex. 5 at 199. Petitioner reported being able to control

her bowel and bladder, but continued to be unable to transfer from a wheelchair. *Id.* She had minimal strength throughout her body. *Id*. at 200. She noted that her husband had become her primary caregiver, assisting with feeding, toileting, and transferring. *Id.* Petitioner expressed frustration and sadness about her condition. *Id*.

Petitioner returned to her neurologist on December 10, 2019. Ex. 5 at 252. She reported improved sensation in and ability to lift her legs – but was still unable to walk. *Id.* She had pain in her hands in the morning, but no other painful paresthesias. *Id.* Dr. Lizama opined that Petitioner might benefit from a second round of IVIG. *Id*. at 257. Petitioner had those treatments between January 13-17, 2020. Id. at 382, 395, 408, 430 and 442.

Petitioner returned to outpatient physical therapy on December 27, 2019. Ex. 5 at 303. She attended 12 sessions before stopping due to the covid-19 pandemic on March 6, 2020. *Id*. At the time of her discharge, Petitioner was still unable to walk and had not met any of her physical therapy goals, although she was making progress. *Id.*

A January 6, 2020 EMG/NCS was consistent with an AMAN diagnosis. Ex. 5 at 349-50.

Petitioner had only sporadic telehealth medical appointments between March 2020 and March 23, 2021, when she had an annual exam with her PCP. Ex. 11 at 26. Although she did not seek significant treatment during the Covid-19 Pandemic, Petitioner stated that she continued to need assistance with all ADLs throughout 2020, relying on her husband, children, and in-home caregivers for help during that period. Ex. 9 at ¶19, Ex. 10 at 15-20. She stated that she was unable to walk without significant assistance or shower independently until November 2020. Ex. 17 at ¶18. She continued to use a cane due to deficits in strength and balance. *Id*.

At her March 23, 2021 annual exam, Petitioner reported improving mobility, but continued imbalance and lack of coordination with walking. Ex. 11 at 26. She was not using any assistive devices to walk and had not fallen. *Id.* She reported that she had regained 80% of her functionality. *Id.*

Petitioner returned to physical therapy on April 1, 2021. Ex. 11 at 64. On evaluation, Petitioner reported progression with mobility, but continued limitations. *Id.* She completed 15 sessions of physical therapy though September 9, 2021. *Id*. at 157. At that time, she reported that she was walking more in her community and doing well overall. *Id.* On September 18, 2021, Petitioner hit her foot against an object and fractured a bone. Ex. 11 at 189, 206. Petitioner states that this occurred because she lost her balance, which was a regular occurrence for her. Ex. 17 at ¶22.

Petitioner had another annual exam on March 22, 2022. Ex. 11 at 310. She reported continued improvement and requested clearance to begin driving again. *Id.* Her doctor recommended continued physical therapy, but found "no current neurological or musculoskeletal deficits to prohibit driving at this time." *Id*. at 312. Petitioner was also required to pass vision, written and driving tests to reinstate her drivers license which she completed on June 21, 2022, approximately 2 years and 9 months after her vaccination. Ex. 13.

Petitioner began her current round of physical therapy on August 15, 2022. Ex. 21 at 36. Petitioner reported that she had steadily improved, but continued to have difficulty, particularly with walking without an assistive device. *Id*. at 37. Petitioner filed records showing 13 additional PT sessions through February 21, 2023. Ex. 23, 26. At her last visit, Petitioner continued to have significant weakness in her ankle plantar flexors and had not reached her goals. Ex. 26 at 126.

## III. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). In *Graves,* the Court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it offers a reasoned understanding of the issues involved in pain and suffering calculations.

## IV. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of his GBS. Therefore, my analysis focuses primarily on the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole, including the medical records and affidavits filed, all assertions made by the parties in written documents, and the parties' arguments during the hearing. Petitioner's medical records and affidavits provide a description of her GBS injury, with a ten-day hospitalization, an 18-day stay in inpatient rehab, two 5-day rounds of IVIG treatment, and a significant

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

amount of physical therapy, which is ongoing. Petitioner needed substantial assistance with her activities of daily living and used a wheelchair for almost a year after her vaccination. She required an assistive device to walk for nearly two years and was unable to drive for nearly three years. Although Petitioner continues to have ongoing sequelae, including deficits in strength, balance, and stamina, her recovery has been good. Overall, Petitioner's treatment course has been more severe and lengthy than many, but not as severe are the worst GBS cases where petitioners remain significantly disabled.

Based upon the foregoing, and considering the parties' written and oral arguments, I find that Petitioner suffered a moderate GBS injury – although as a class, GBS injuries are distinguishable from many other kinds of common Program vaccine injuries. Rather (and as I have noted in prior decisions), GBS constitutes a particularly frightening type of vaccine injury – and as a result, a higher-than-average pain and suffering award is appropriate. *See Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685 at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021).

At the same time, however, the considerations that always impact how a pain and suffering award is calculated – level of pain, length of hospitalization and inpatient rehabilitation, degree and number of procedures for treatment, duration of treatment, and overall recovery – impact the final figure to be awarded. Some GBS injuries feature permanent disabilities, while others are characterized by a better recovery. Here, Ms. Hernandez's GBS injury required significant medical treatment, including two rounds of IVIG treatment and years of physical therapy treatment (which continue) and impacted her ability to care for her three children and her father-in-law, who had suffered a stroke. But her subsequent condition is much improved, even with some lingering deficits common to GBS's aftermath.

Petitioner primarily relied on *Creely v. Sec'y of Health & Human Servs.*, No. 18-1434, 2022 WL 1863921 (Fed. Cl. Spec. Mstr. April 27, 2022), and *Hood v. Sec'y of Health & Human Servs.*, No. 16-1042V, 2021 WL 5755324 (Fed. Cl. Spec. Mstr. Oct. 19, 2021) – in which the petitioners received pain and suffering awards of $200,000 to $250,000 - to support the past/actual component of her pain and suffering demand.[4] While Petitioner's GBS treatment was similar to those of the petitioners in those case, those petitioners were unable to return to their professions as a result of the ongoing sequela of their GBS injuries. There is no similar impact in this case, as Ms. Hernandez

[4] Petitioner also cited *Fedewa v. Sec'y of Health & Human Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020), *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-0428, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), and *Johnson v. Sec'y of Health & Human Servs.*, No. 16-1356, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) – all of which involved petitioners who were awarded between $170,000 and $180,000 in past pain and suffering.

was not employed at the time of her injury – and therefore, the amount to be awarded should be somewhat lower.

Ms. Hernandez has also requested an award of future pain and suffering, in recognition of her ongoing sequelae. Yet the record reveals that she has made a substantial (although not complete) recovery, with some residual deficits in balance and strength common to individuals recovering from GBS. And she has not otherwise offered evidence establishing employment limitations or significant debilitation – the kind of proof I deem necessary to justify a future award of pain and suffering. The fact that Petitioner continues to treat her ongoing symptoms with physical therapy is not in itself grounds for this component (although I can consider it in calculating her “actual” pain and suffering award, since it evidences her current status).

I do not find that Respondent fully defended his lower sum proposed, although it is not facially unreasonable, and I concur herein that a future component is not justified by the facts of this case.

Accordingly, balancing the severity of Petitioner’s GBS injury and the impact on her personally against her demonstrably good recovery, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$192,000.00 in total compensation for actual/past pain and suffering** is reasonable and appropriate in this case, with no future component awarded.

## V. Award for Past and Future Unreimbursed Expenses

### a. Past Unreimbursed Expenses

Petitioner requests **$3,608.64 in past unreimbursable expenses**. ECF No. 42. Respondent does not dispute this sum, and therefore Petitioner is awarded it without adjustment. *Id.*

### b. Future Unreimbursed Expenses

In her brief, Petitioner requested $500 per year in future out-of-pocket expenses for the remainder of her life, reduced to a present value of $16,242.33. Br. at 19. Because Petitioner provided reliable evidence that she continues to suffer ongoing deficits in balance, strength, and stamina that she treats with physical therapy, I informed the parties that I would award a component of future out-of-pocket expenses to cover Petitioner’s ongoing treatment. However, I also found that Petitioner’s request for an award spanning the remainder of her lifetime was not reasonable considering her fairly mild ongoing sequelae. I therefore asked Petitioner to submit additional evidence regarding the future

treatment she requires - specifically the duration of her current course of physical therapy. I also asked the parties to attempt to agree on an amount of an award.

After the March 24, 2023 hearing, Petitioner consulted with her doctors, including her treating physical therapist, and has revised her request to $344.10, representing her out-of-pocket expenses for ten additional physical therapy treatments. *See* ECF No. 42. The parties, however, were still unable to reach agreement on whether this additional sum was reasonable. *Id*.

Future unreimbursed expenses may be paid when they are "reasonably necessary." Section 15(a)(1)(A)(iii)(II). It can be difficult to determine what is "reasonably necessary" – particularly here – where Petitioner's vaccination injury began approximately 3.5 years ago. Although Petitioner's PCP, her physical therapist, and a neurologist could not give a specific prediction for the duration of her treatment, all agreed that she had not yet fully recovered from her injury. *See* Ex. 27. As a result of her inquiries, Petitioner has revised her request to a future award covering her expenses for an additional ten physical therapy treatments. ECF No. 42. As Petitioner currently attends twice a month (*See* Ex. 27 at ¶9), Petitioner's request is for five additional months of treatment. Petitioner's PCP opined that "It is rare to continue physical therapy longer than 4 years after your initial diagnosis." Ex. 27D. Four years from Petitioner's injury would be September 2023, or approximately five months from the date of this order. Therefore, I find that Petitioner's request is reasonable, and she is awarded **$344.10 in future out-of-pocket expenses.**

## Conclusion

For all of the above reasons, the I award **Petitioner a lump sum payment of <u>$195,952.74</u>,** (representing $192,000.00 for Petitioner's actual pain and suffering, $3,608.64 for past unreimbursed medical expenses, and $344.10 in future unreimbursed expenses) **in the form of a check payable to Petitioner Raquel Hernandez.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[5]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.